UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Jess Kruchoski and Luke Tornquist,

                Plaintiffs,

v.

MiMedx Group, Inc. and
Parker Petit,

                Defendants.

Court File No.:

**COMPLAINT
AND
JURY DEMAND**

---

Plaintiffs Jess Kruchoski and Luke Tornquist, for their Complaint against

Defendants MiMedx Group, Inc. and Parker Petit, state and allege as follows:

## **INTRODUCTION**

1.      Plaintiffs Jess Kruchoski and Luke Tornquist are former employees of

MiMedx Group, Inc. (MiMedx), a publicly traded company with about 500 employees.

During his four-year tenure at MiMedx, Mr. Kruchoski was a top-performing sales

employee. Under Kruchoski's leadership, Tornquist became MiMedx's number one sales

representative in the country.

2.      Over the course of their employment, Kruchoski and Tornquist

discovered a fraudulent revenue recognition scheme orchestrated by MiMedx's executive

leadership, including MiMedx's CEO, Parker Petit. MiMedx employed this fraudulently

revenue recognition scheme to artificially inflate quarterly revenue and deceive investors.

3.      Kruchoski and Tornquist jointly reported and opposed MiMedx's fraud. Defendants immediately retaliated against them with threats, intimidation, and ultimately, termination after a retaliatory investigation.

## PARTIES

4.      Plaintiff Jess Kruchoski resides in Wisconsin and intends to remain there indefinitely.

5.      Plaintiff Luke Tornquist resides in Minnesota and intends to remain there indefinitely.

6.      Defendant MiMedx Group, Inc. is a Florida corporation with its principal place of business in Marietta, Georgia.

7.      On information and belief, Defendant Parker Petit resides in Georgia and intends to remain there indefinitely.

## JURISDICTION AND VENUE

8.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and diversity jurisdiction under 28 U.S.C. § 1332.

9.      Venue is appropriate because a substantial number of facts giving rise to this action occurred within the District of Minnesota.

## FACTS

**Background on MiMedx Group, Inc. and Parker Petit**

10.      Human placental tissue has been used for decades to promote wound healing. The amnion and chorion layers of the amniotic membranes are rich in growth factors that support the healing process.

2

11.     Due to logistical issues surrounding the availability of fresh amnion, risks of blood-borne pathogens, and the need for surgeons to source from their own hospitals' OB-GYN ward, the use of amnion (the innermost membrane that encloses the embryo) was never commercially viable.

12.     That has changed. One of MiMedx's subsidiaries developed a proprietary method that safely and effectively manipulates placental tissue to create implants for a wide variety of surgical applications. Essentially, the process involves dehydrating and sterilizing the tissue. The process gives the tissue a shelf life of up to five years at ambient room temperature. MiMedx has developed a number of products for acute and chronic wound care as a result of this proprietary method.

13.     The product primarily at issue here is EpiFix, which is a dehydrated human amnion/chorion membrane tissue graft composed of a layer of epithelial cells, a basement membrane, and an avascular connective tissue matrix.

14.     Defendant Parker "Pete" Petit is the board chairman and CEO of MiMedx.

**Background on the Plaintiffs**

15.     Kruchoski is a former MiMedx employee. During his employment, Kruchoski frequently performed work on behalf of MiMedx in Minnesota. In July 2012, he started his employment at MiMedx as an Account Executive of Government Sales for the company's Wisconsin and Minnesota territories. In October 2013, MiMedx promoted Kruchoski to Regional Sales Director of the North Central Region. He held this position until his termination on December 12, 2016.

16.     Luke Tornquist is a former MiMedx employee. He was Account Executive of MiMedx's Greater Minneapolis territory from October 2013 until his termination on December 12, 2016. Under the leadership of Kruchoski, Tornquist became MiMedx's number one sales representative in the United States.

**2014–2016: MiMedx Employs a Fraudulent Revenue Recognition Scheme**

17.     Since at least 2014, MiMedx has engaged in a scheme of "channel stuffing," which MiMedx uses to fraudulently recognize revenue in its certified financial statements before the revenue had been realized or realizable and earned.

18.     The channel-stuffing scheme implicates AvKARE, Inc. (AvKARE), a Tennessee company and Federal Supply Schedule contractor, as well as the Department of Veterans Affairs (VA). In 2014, MiMedx entered into a distribution agreement with AvKARE, which allowed MiMedx to sell directly to government accounts, including the VA. Although MiMedx obtained its own FSS contract in 2015, MiMedx and AvKARE extended the distribution agreement through June 30, 2016.

19.     The channel-stuffing scheme is simple: at the direction and pressure of MiMedx's executive officers and senior management, MiMedx sales representatives order EpiFix grafts for delivery to VA hospitals throughout the country.

20.     Neither AvKARE nor the end customer—the VA—requests the EpiFix orders.

21.     The channel stuffing routinely occurs at the end of each financial quarter.

22.     Under the scheme, MiMedx sends its product directly to VA hospitals, where MiMedx sales representatives are responsible for procuring sales of the products,

managing MiMedx product on the shelves, tracking MiMedx inventory on the shelves, and accounting for any lost or damaged product.

23.     At no point in the distribution channel does AvKARE exercise physical control over the product, assume the risks and rewards of ownership, or otherwise play a role in reselling the product to the end customer.

24.     MiMedx then claims these orders as revenue to meet its quarterly forecasts.

25.     The VA hospitals are typically unaware of the channel-stuffing orders, much less the volume of MiMedx's products in their possession.

26.     In the last month of 2015, over $10 million of MiMedx products was sitting on VA hospitals' shelves, which the hospitals had neither bought nor requested.

27.     MiMedx stuffed its channels with the intent of slowly feathering back returns over time, concealing the return of product it had previously recognized as revenue by balancing them against actual revenue in future reporting periods.

**The Application of Accounting Principles to MiMedx's Channel-stuffing Scheme**

28.     The Financial Accounting Standards Board (FASB)—recognized by the Securities and Exchange Commission as the designated accounting standard setter for public companies—promulgates Generally Accepted Accounting Principles (GAAP) on revenue recognition.

29.     Under FASB Accounting Standard No. 48, if an enterprise sells its product but gives the buyer the right to return the product, revenue from the sales

transaction shall be recognized at time of sale only if all of the following conditions are met:

    a. The seller's price to the buyer is substantially fixed or determinable at the date of sale;

    b. The buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product;

    c. The buyer's obligation to the seller would not be changed in the event of theft or physical destruction or damage to the product;

    d. The buyer acquiring the product for resale has economic substance apart from that provided by the seller;

    e. The seller does not have significant obligations for future performance to directly bring about resale of the product by the buyer;

    f. The amount of future returns can be reasonably estimated. The following factors may impair the ability to make a reasonable estimate:

        i. Susceptibility of product to significant external factors, such as technological obsolescence or changes in demand;

        ii. Relatively long periods in which a particular product may be returned;

        iii. Absence of historical experience with similar types of sales of similar products, or inability to apply such experience because of changing circumstances;

        iv. Absence of a large volume of relatively homogeneous transactions;

        v. Other factors that preclude a reasonable estimate.

Sales revenue and cost of sales that are not recognized at time of sale because the foregoing conditions are not met shall be recognized either when the return privilege has substantially expired or if those conditions subsequently are met, whichever occurs first.

30.     MiMedx's revenue recognition scheme does not meet the conditions for recognizing revenue under GAAP. Even if there is a transaction between AvKARE and MiMedx at the time of shipment, a number of contingencies preclude MiMedx from properly recognizing this revenue at the time of shipment. For instance:

a.     *MiMedx maintains liability for lost or damaged products allegedly "sold" to AvKARE and placed on VA hospitals' shelves.* Whether it is a condition of a formal, written agreement, an oral side agreement, or established practice, MiMedx has agreed to accept liability returns on product placed on the shelves.  In this event, MiMedx must credit AvKARE for returned, lost, or damaged product. There also remains a distinct possibility that the VA (or AvKARE) could send back the unpurchased product sitting on their shelves at any time.

b.     *MiMedx has significant obligations for future performance to directly bring about resale of the product by the buyer.* MiMedx sales representatives work on location at VA hospitals throughout the country and market the product. On information and belief, AvKARE plays no role in procuring customer sales of the products it has allegedly purchased from MiMedx.

7

    c.    *The amount of future returns cannot be reasonably estimated.* Whether it is a condition of a formal, written agreement, an oral side agreement, or established practice, there are relatively long periods in which EpiFix products may be returned. There is still unpurchased EpiFix product that MiMedx shipped in the first quarter of 2016 that MiMedx recognized as revenue. Even worse, MiMedx was aware at the time of recognizing product sales as revenue that the same EpiFix products would have to be returned in future quarters because of a lack of demand.

31.    SEC Staff Accounting Bulletin No. 101, 64 Fed. Reg. 68936 (Dec. 3, 1999) (codified at 17 C.F.R. 211), states that transactions within the scope of specific authoritative accounting literature should be applied. Further, the SEC will consider existing accounting standards as well as broad revenue recognition criteria specified in the FASB's conceptual framework that provide basic guidelines for revenue recognition.

32.    Based on FASB guidelines, the SEC has concluded that revenue should not be recognized until it is realized or realizable and earned. Revenue is generally realized or realizable and earned when all of the following criteria are met:

    a.    Persuasive evidence of an arrangement exists;

    b.    Delivery has occurred or services have been rendered;

    c.    The seller's price to the buyer is fixed or determinable; and

    d.    Collectability is reasonably assured.

33.     In the context of consignment arrangements, the SEC holds that the presence of conditions set forth in FASB Accounting Standard No. 48 in a transaction precludes revenue recognition even if title to the product has passed to the buyer.

34.     Nevertheless, MiMedx publicly recognizes the shipment of this inventory as revenue in its filings with the Securities and Exchange Commission. Moreover, MiMedx misleadingly categorizes its revenue as government sales, even though the government is not a party to the initial "sale." In some cases, the product is returned to MiMedx without the government purchasing the product at all.

35.     In its certified filings, MiMedx has failed to adequately disclose its practice of recognizing revenue upon shipment to VA facilities even in the absence of an executed purchase order or payment from a customer. Moreover, MiMedx fails to adequately disclose the contingent nature of these alleged sales.

36.     With respect to accelerated, discounted sales that are realized and earned in the reporting quarter, MiMedx has failed to provide any disclosures in financial statements that it accelerated material amounts of sales revenue as a business practice and discuss its financial implications for future periods. Finally, MiMedx has failed to disclose its practice of slowly feathering back returns.

37.     The failure to provide these disclosures results in the artificial inflation of MiMedx's revenue for current reporting periods. The implication for future reporting periods is foreseeable: MiMedx cannot recognize revenue from many *actual* government sales—those transactions that occur when the VA actually purchases MiMedx's products—because the company has already declared revenue from those products in

previous quarters. Further, if the VA were to return products that it had never ordered, MiMedx would earn nothing from a transaction it has already reported as revenue in its certified filings.

**2015: Kruchoski Objects to MiMedx's Revenue Recognition Scheme and Reports That He Believes It to Be Unlawful**

38.     Kruchoski consistently objected to MiMedx's fraudulent revenue recognition scheme and reported that he believed the scheme to be unlawful.

39.     On December 28, 2015, MiMedx's Government Market Development Manager Matt Bloemer, called Kruchoski.

40.     Mr. Bloemer told Kruchoski that upper management instructed that Kruchoski add superfluous product to the shelves of VA hospitals within his sales region.

41.     By way of explanation, Bloemer said that the company was "way behind" on its projected revenue.

42.     Kruchoski told Bloemer he believed the practice was illegal and that he should have someone from upper management send an email with such a request.

43.     No one from upper management sent Kruchoski such a request in writing.

44.     Instead, two days later, on December 30, 2015, MiMedx's Senior Director of Operations, Lou Roselli, called Kruchoski.

45.     Mr. Roselli told Kruchoski that CEO Parker "Pete" Petit ordered the MiMedx sales force to submit false orders for unpurchased product for the purpose of recognizing the "revenue" in the company's financial statements.

46.     At the very least, Mr. Petit wanted sales expected for the first quarter of 2016 to be submitted to MiMedx as a current-quarter sale.

47.     However, based on the volume of channel-stuffing MiMedx was demanding of its sales representatives, the practice extended beyond the acceleration of sales by a quarter.

48.     During the December 30, 2015 call, Kruchoski expressed his concern to Roselli that MiMedx's reporting practices were unlawful.

49.     Roselli responded by noting that Petit had backed his order with a threat for those employees who did not comply: "[Your] ass is grass." Kruchoski received continued requests from senior MiMedx management to "stuff the shelves" in the final month of each quarter through about June 2016.

50.     Roselli specifically stated MiMedx's intent to ship the product, recognize it as revenue, and have the product returned in subsequent fiscal quarters.

**MeMidx Unlawfully Denies Kruchoski a Promotion**

51.     On January 4, 2016, MiMedx's then-Executive Vice President of MiMedx's Wound Care division, Mike Carlton, told Kruchoski that he would not be considered for a promotion to Area Vice President. The company instead, without posting the position or conducting interviews with any other candidates, promoted MiMedx employee Steve Blocker that same day.

52.     Mr. Blocker was Kruchoski's subordinate.

53.     Kruchoski was a better performer than Blocker, and at no time did Mr. Carlton indicate that Kruchoski's performance was lacking or otherwise a factor in the decision.

54.     Carlton said Kruchoski was not considered for the promotion on the grounds that he was *"too vocal"* in his objections to MiMedx's shelf-stuffing practice.

55.     Carlton added that Kruchoski's status as a single father was also a factor in the company's failure to promote him, because management concluded he could not complete his duties because of his parenting obligations.

**MiMedx's Fraudulent Revenue Recognition Scheme Continues and Enlarges**

56.     On January 15, 2016, MiMedx's Executive Vice President and Chief Commercial Officer Chris Cashman sent an internal memo to the entire company describing the aggressive shelf-stuffing practices of Osiris, a MiMedx competitor.

57.     After reading that email, Kruchoski called his new supervisor, Steve Blocker, and expressed his concern that MiMedx was doing the exact same thing. Blocker confirmed that Kruchoski might be right. On information and belief, Blocker made no further investigation of Kruchoski's report.

58.     On March 28, 2016, MiMedx's Chief Operating Officer Bill Taylor sent out a company-wide memorandum stating that the company's sales reporting and its sales to AvKARE were complex and that MiMedx's financial statements met GAAP standards of revenue recognition.

59.     That same day, Kruchoski received word that Mr. Cashman and Executive Vice President of Operations Mark Diaz developed a scheme of filling FedEx packages

about the size of a shoebox with EpiFix and covertly sending them to VA hospitals around the country.

60.     MiMedx addressed these shipments to the attention of a particular VA clinic, e.g., podiatry. Under this scheme, the shoebox landed in the VA's shipping and receiving department. A nurse, technician, or a sales representative picked up the package, brought it to the addressed department, removed its contents, and placed the product in a storage closet on the premises.

61.     MiMedx executed multiple orders for fifteen of MiMedx's most expensive grafts (7x7 EpiFix) and shipped them to VA hospitals without a purchase order from the VA or the VA even knowing they were on hospitals' shelves—in some cases even unbeknownst to the representatives covering the accounts.

62.     Between March 28, 2016 and March 31, 2016—at the tail-end of MiMedx's first fiscal quarter—MiMedx sent 330 7x7 EpiFix grafts to 17 VA hospitals across the country. MiMedx sent an additional 75 7x7 grafts in packages that contained additional sizes to three other VAs.

63.     Therefore, at minimum, MiMedx sent 405 7x7 EpiFix grafts in the final four days of Q1 2016, mostly to VA accounts that typically use *less than five 7x7 EpiFix grafts* throughout the entire year. In all, MiMedx sent $2,462,508 of product to 20 VAs in the last four days of Q1 2016.

64.     In at least one case, a sales representative, who was working at a VA with an inventory management system, intercepted a shoebox before the VA inventoried its contents. At the direction of MiMedx management, the sales representative stored the

human tissue grafts at his personal residence until MiMedx management accepted its return.

65.     Consistent with Roselli's prior statements to Kruchoski, MiMedx understood at the time it recognized these shipments as revenue that most of the 7x7 grafts would be slowly returned with coordination from MiMedx management. MiMedx further planned to conceal losses associated with these returns with revenue from future fiscal quarters.

66.     As of November 2016, most of these 7x7 EpiFix grafts have remained unused and unpurchased by the end customer, have been returned to MiMedx, or have been concealed in some way by MiMedx sales representatives until MiMedx authorizes the return. For instance, MiMedx directed at least two sales representatives to store EpiFix grafts at their personal residences.

67.     In the fall of 2016, Kruchoski persuaded the Minneapolis VA hospital to purchase approximately $461,000.00 worth of MiMedx products already on the hospital's shelves. Under then-current commission structure, the sale entitled Kruchoski and Tornquist to certain commissions.

68.     However, MiMedx denied, and continues to deny, commissions due and owing Kruchoski and Tornquist from the large-scale VA purchase.

**November 2016: Kruchoski and Tornquist Report Legal Violations and Are Immediately Subject to Retaliation**

69.     On November 2, 2016, Kruchoski and Tornquist submitted a joint report to MiMedx management and legal counsel about MiMedx's fraudulent revenue

recognition scheme in violation of Sarbanes-Oxley and the failure to pay commissions in violation of Minnesota, Wisconsin, and Georgia statutes.

70.     On November 3, 2016, Kruchoski received a phone call from Steve Blocker. During that phone call, Blocker brought up Kruchoski and Tornquist's report of Sarbanes-Oxley violations. Blocker asked Tornquist if he really wished to sign onto that portion of the joint report. Blocker warned Tornquist that doing so would "not be good for" him. He reminded Tornquist that Tornquist had a wife and children and cautioned him to "think of [his] family."

71.     That same day, Kruchoski received a phone call from a co-employee. The co-employee reported that Blocker had outed Kruchoski as a whistleblower to Kruchoski's co-employees.

72.     Also that same day, Kruchoski also received a response from Lexi Haden, MiMedx's chief legal counsel. In her response, Ms. Haden falsely asserted that Kruchoski had asked MiMedx "to assist in shielding income" from his former spouse.

73.     On November 4, 2016, Kruchoski and Tornquist supplemented their joint letter individually to set forth MiMedx's fraudulent revenue recognition scheme in greater detail.

74.     On November 7, 2016, *one business day* after Kruchoski's report spelling out the fraudulent revenue recognition scheme in detail, Thornton Kuntz, Senior Vice President of Administration and Human Resources, placed Kruchoski on a performance improvement plan, which threatened termination.

75.     This performance improvement plan skipped several levels of progressive discipline outlined in MiMedx's personnel policies. In the performance improvement plan, Mr. Kuntz reprimanded Kruchoski for his protected report.

76.     On November 18, 2016, MiMedx employee Adam Dach flew to Atlanta, Georgia to meet with upper management, who interviewed Mr. Dach for an expansion of his territory consisting of most of Kruchoski's territories.

77.     Also on this day, Kevin Lilly, the Executive Vice President of Wound Care Sales, called one of Kruchoski's subordinates to "gauge his interest in management."

78.     On November 21, 2016, Blocker called another one of Kruchoski's subordinates to see if he would be interested in a potential management role.

79.     That same day, Haden interviewed Kruchoski and Tornquist. Kruchoski and Tornquist provided additional information related to MiMedx's revenue recognition scheme. During the interview, Kruchoski and Tornquist repeatedly stated that they feared retaliation for their reporting. At no time did Haden assure Kruchoski and Tornquist that they would be free from retaliation.

80.     At 11:54 p.m. that evening, Kruchoski was made aware Blocker had made progress on Kruchoski's replacement.

81.     On November 22, 2016, MiMedx informed Kruchoski that it was cutting his commissionable geography by removing Iowa, Nebraska, North Dakota, and South Dakota from his territory—resulting in estimated monthly commission losses of $3,500 to $4,000.

82.     MiMedx tried to characterize this territory reduction as part of a plan that predated Kruchoski's November 2 and 4 reports. However, during a meeting on October 19, 2016, Blocker informed Kruchoski that his region would not be touched in a company-directed initiative to realign regions. Depriving Kruchoski of his territories would result in major territory disparities between Regional Sales Directors, and the decision to do so was made only after Kruchoski's protected reports.

83.     On November 24, 2016, after MiMedx told Kruchoski he was to receive 2,750 Restricted Stock Options for his Q3 performance, the options had not been placed in his account. Upon asking his direct manager about their status, he directed Kruchoski to Human Resources.

84.     On or around November 29, 2016, Roselli contacted several MiMedx co-employees and asked about alleged misconduct on the part of Kruchoski and Tornquist.

85.     On December 12, 2016, Petit stated during a meeting that MiMedx was going to hurt Messrs. Kruchoski's and Tornquist's careers and their families.

86.     Later in the evening of December 12, 2016, MiMedx terminated Kruchoski and Tornquist simultaneously in Minneapolis, Minnesota.

## COUNT ONE

### RETALIATION IN VIOLATION OF
### THE DODD-FRANK ACT, 15 U.S.C. § 78u-6(h)
### (Against MiMedx Group, Inc.)

87.     Plaintiffs re-allege each and every paragraph of this Complaint.

88.     Under the Dodd-Frank Act, no employer may discharge, demote, suspend, threaten, harass, directly or indirectly, or in any other manner discriminate

against, a whistleblower in the terms and conditions of employment because of any lawful act done in making disclosures that are protected under the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7201 *et seq.*

89.     Defendant MiMedx took adverse action against Plaintiffs because of their reports of conduct that would violate Section 906 of the Sarbanes Oxley Act, 18 U.S.C. §1350(c), Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q, Section 10(b) of Securities Exchange Act of 1934, 15 U.S.C. § 78j; and Rule 10b-5 of the Securities Exchange Act, 17 C.F.R. § 240.10b-5.

90.     Defendant failed to take all reasonable steps to prevent retaliation against Plaintiffs from occurring.

91.     Defendant's retaliatory conduct has adversely affected Plaintiffs' status as employees.

92.     Defendant's retaliatory conduct might have dissuaded a reasonable person from making or supporting a report.

93.     The unlawful employment practices complained of above were intentional and were performed by Defendant with malice or reckless indifference to the Dodd-Frank Act.

94.     As a direct and proximate result of Defendant's illegal conduct, Plaintiffs have suffered, and continue to suffer, emotional distress, humiliation, embarrassment, pain and suffering, loss of reputation, loss of enjoyment of life, lost wages and benefits, and have incurred attorneys' fees and expenses and other serious damages.

## COUNT TWO

### UNLAWFUL DISCHARGE IN VIOLATION OF
### MINNESOTA STATUTES SECTION 181.931 SUBDIVISION 1(1)
### (Against MiMedx Group, Inc.)

95.     Plaintiffs' re-allege each and every paragraph of this Complaint.

96.     Minnesota Statutes section 181.932 subdivision 1(1) prohibits retaliation against employees for making good-faith reports of violations of law. The statute prohibits retaliation against an employee because the employee, in good faith, reports a planned, suspected, or actual violation of any federal or state law or common law or rule adopted pursuant to law to an employer.

97.     Plaintiffs reported what they reasonably and in good faith believed to be a planned, actual, or suspected violations of law, including but not limited to Minn. Stat. 181.101, Chapter 109 of the Wisconsin Statutes, Georgia Code 34-7-2, Section 906 of the Sarbanes Oxley Act, 18 U.S.C. §1350(c), Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q, Section 10(b) of Securities Exchange Act of 1934, 15 U.S.C. § 78j; and Rule 10b-5 of the Securities Exchange Act, 17 C.F.R. § 240.10b-5.

98.     Defendant MiMedx took adverse action against Plaintiffs because of their reports.

99.     Defendant failed to take all reasonable steps to prevent retaliation against Plaintiffs from occurring.

100.    Defendant's retaliatory conduct has adversely affected Plaintiffs' status as employees.

101.  Defendant's retaliatory conduct might have dissuaded a reasonable person from making or supporting a report.

102.  The unlawful employment practices complained of above were intentional and were performed by Defendant with malice or reckless indifference to Minnesota Statutes section 181.932 subdivision 1(1).

103.  As a direct and proximate result of Defendant's illegal conduct, Plaintiffs have suffered, and continue to suffer, emotional distress, humiliation, embarrassment, pain and suffering, loss of reputation, loss of enjoyment of life, lost wages and benefits, and have incurred attorneys' fees and expenses and other serious damages.

## COUNT THREE

### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (Against Parker Petit)

104.  Plaintiffs re-allege each and every paragraph of this Complaint.

105.  Defendant Parker Petit was a third party to an employment relationship between Plaintiffs and MiMedx.

106.  Petit procured Plaintiffs' discharge from MiMedx.

107.  Petit's conduct was independently tortious, unjustified, and motivated by malice and bad faith, personal ill will, spite, hostility, or a deliberate intent to harm Plaintiffs.

108.  As a direct and proximate result of Defendant's illegal conduct, Plaintiffs have suffered, and continue to suffer, emotional distress, humiliation, embarrassment, pain and suffering, loss of reputation, loss of enjoyment of life, lost wages and benefits, and have incurred attorneys' fees and expenses and other serious damages.

## COUNT FOUR

### MARITAL STATUS DISCRIMINATION
### IN VIOLATION OF THE MINNESOTA HUMAN RIGHTS ACT
**(By Jess Kruchoski Against MiMedx Group, Inc.)**

109.    Plaintiffs re-allege each and every paragraph of this Complaint.

110.    Defendant, through its managers and officials acting on its behalf and within the scope of their employment, engaged in unlawful employment practices against Plaintiff Jess Kruchoski in violation of the MHRA, Minn. Stat. § 363A.01 *et seq.* These practices include, but are not limited to, failing to promote Kruchoski because of his marital status.

111.    Defendant failed to take all reasonable steps to prevent discrimination based upon Kruchoski's marital status from occurring.

112.    Kruchoski's marital status was a motivating factor in his adverse treatment.

113.    Defendant's discriminatory conduct has deprived Kruchoski of equal employment opportunities and otherwise adversely affected his status as an employee.

114.    The unlawful employment practices complained of above were intentional and performed by Defendant with malice and reckless indifference to the MHRA, which protects Kruchoski.

115.    As a direct and proximate result of Defendant's illegal conduct, Kruchoski has suffered, and continue to suffer, emotional distress, humiliation, embarrassment, pain and suffering, loss of reputation, loss of enjoyment of life, lost wages and benefits, and has incurred attorneys' fees and expenses and other serious damages.

## COUNT FIVE

### FAMILIAL STATUS DISCRIMINATION
### IN VIOLATION OF THE MINNESOTA HUMAN RIGHTS ACT
### (By Jess Kruchoski Against MiMedx Group, Inc.)

116.    Plaintiff re-alleges each and every paragraph of this Complaint.

117.    Defendant MiMedx Group, Inc., through its managers and officials acting on its behalf and within the scope of their employment, engaged in unlawful employment practices against Plaintiff Jess Kruchoski in violation of the MHRA, Minn. Stat. § 363A.01 *et seq.* These practices include, but are not limited to, failing to promote Kruchoski because of his familial status.

118.    Defendant failed to take all reasonable steps to prevent discrimination based upon Kruchoski's familial status from occurring.

119.    Kruchoski's familial status was a motivating factor in his adverse treatment.

120.    Defendant's discriminatory conduct has deprived Kruchoski of equal employment opportunities and otherwise adversely affected his status as an employee.

121.    The unlawful employment practices complained of above were intentional and performed by Defendant with malice and reckless indifference to the MHRA, which protects Kruchoski.

122.    As a direct and proximate result of Defendant's illegal conduct, Kruchoski has suffered, and continue to suffer, emotional distress, humiliation, embarrassment, pain and suffering, loss of reputation, loss of enjoyment of life, lost wages and benefits, and has incurred attorneys' fees and expenses and other serious damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray:

a. That the practices of Defendants complained of herein be adjudged, decreed, and declared to be in violation of the rights secured to Plaintiffs by state and federal law;

b. That Defendants be required to make Plaintiffs whole for Defendants' adverse, discriminatory, retaliatory, and unlawful actions through restitution in the form of back pay, with interest of an appropriate inflation factor;

c. That Plaintiffs be awarded front pay and the monetary value of any employment benefits they would have been entitled to as employees of Defendants;

d. That Plaintiffs be awarded compensatory damages in an amount to be determined at trial;

e. That the Court enjoin Defendants from engaging in the practices complained of herein;

f. That Plaintiffs be awarded punitive damages as permitted by statute;

g. That Plaintiffs be awarded treble damages as permitted by statute;

h. That Plaintiffs be awarded liquidated damages as permitted by statute;

i. That Plaintiffs be awarded any civil penalties as permitted by statute.

j. That the Court award Plaintiffs their attorneys' fees, costs and disbursements pursuant to statute; and

k. That the Court grant such other and further relief as it deems fair and equitable.

PLAINTIFFS DEMAND TRIAL BY JURY ON ALL COUNTS WHERE AVAILABLE.

Dated: December 15, 2016

**HALUNEN LAW**

/s/Clayton D. Halunen

Clayton D. Halunen, #219721
Stephen M. Premo, #393346
1650 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 605-4098
Facsimile: (612) 605-4099
halunen@halunenlaw.com
premo@halunenlaw.com

*ATTORNEYS FOR PLAINTIFF*